IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs December 20, 2016

**STATE OF TENNESSEE v. JOHN LOWERY**

**Appeal from the Criminal Court for Knox County**
No. 98047    Bobby R. McGee, Judge

_____

**No. E2016-00587-CCA-R3-CD**

_____

Petitioner, John Lowery, appeals from the trial court's denial of his petition for writ of error coram nobis. Eleven years after Petitioner's convictions and sentences were affirmed on direct appeal, Petitioner filed a petition for writ of error coram nobis, which was summarily dismissed by the trial court. In his petition, Petitioner asserted that two witnesses recanted their identification of Petitioner as the shooter, and a previously unknown witness said that Petitioner was not at the scene of the crime. On appeal, this court reversed the court's summary dismissal of the petition and remanded for an evidentiary hearing. On remand, the State filed a response, asserting that the statute of limitations had run. Following an evidentiary hearing, the trial court denied relief, finding the two witnesses who recanted not credible and that the testimony of the newly discovered witness did not meet the test that it "might have" changed the outcome of the trial. Having reviewed the entire record and the briefs of the parties, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and JOHN EVERETT WILLIAMS, JJ., joined.

Joseph A. Fanduzz, Knoxville, Tennessee, for the appellant, John Lowery.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Charme P. Allen, District Attorney General; and Leland Price, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Procedural history*

In 1998, Petitioner was convicted by a jury of first degree premeditated murder and attempted first degree murder and received consecutive sentences of life and 25 years, respectively. *See State v. John Bradley Lowery*, No. E1998-00034-CCA-R3-CD, 2000 WL 748103, at *1 (Tenn. Crim. App., June 12, 2000), *perm. app. denied* (Tenn., Feb. 20, 2001). A panel of this court affirmed Petitioner's convictions and sentences on direct appeal. *Id*.

On September 4, 2011, Petitioner filed a petition for writ of error coram nobis. He filed an amended petition on May 22, 2012. On June 27, 2012, the trial court dismissed the petition, finding that the evidence alleged by Petitioner was not newly discovered evidence. *See John Lowery v. State*, No. E2012-01613-CCA-R3-PC, 2013 WL 4767188, at *3 (Tenn. Crim. App., Sept. 4, 2013), *no perm. app. filed*. On appeal, a panel of this court remanded for a hearing after concluding that the trial court applied the wrong standard in dismissing the petition and that Petitioner had made a sufficient threshold to warrant a hearing. *Id*. at *5.

Following a hearing on October 2, 2014, the trial court denied the petition by an order dated February 23, 2016.

The facts of Petitioner's underlying convictions, as summarized by a panel of this court on direct appeal, are:

> At approximately 6:40 a.m. on October 8, 1996, William Boatwright and his cousin, Vincent Hartsell, went to Kirk's Market in Knoxville to purchase food items. Boatwright went inside the market, while Hartsell remained in the car. After Boatwright made his purchase, he walked outside, and Jay Harris, who was standing outside, called him to the side of the building so that they could converse. After Boatwright spoke with Harris for a few seconds, he heard a gunshot. When he turned around, he saw the appellant running towards him carrying a handgun. As Boatwright attempted to reenter the store, the appellant shot him in the chest. Boatwright went inside the store and crawled behind the counter, and the appellant went inside after him, firing his gun. However, because the store employee began screaming, the appellant fled the scene. Boatwright remained in the store for several minutes and then went outside to check on Hartsell, who had been shot in the neck while waiting in the car.

Malik Hardin, a friend of Boatwright and Hartsell, witnessed the shooting while sitting in his car in the Kirk's Market parking lot. Boatwright got into Hardin's car and drove to a relative's home, while Hardin stayed with Hartsell until the police arrived.

Boatwright was subsequently transported to the hospital, where he told the police that "J.B." shot Hartsell and him. The police compiled a photographic lineup, and Boatwright identified the appellant as the shooter. Hardin also viewed the photographic lineup and identified the appellant as the man who shot Boatwright and Hartsell.

The next day, Hartsell, who was sixteen (16) years of age, died as a result of a gunshot wound to the neck.

Investigating officers recovered a .45 caliber bullet behind the counter in the store as well as a .45 caliber shell casing in front of the store counter. The police also discovered a bullet hole in the counter. Another .45 caliber bullet casing was found in the car where Hartsell was shot, and officers found an "eight ball" of crack cocaine by the right passenger door. Don Carman, a TBI forensic firearms examiner, examined the bullet casings and determined that the casing found in the store and the casing found in the car were fired from the same weapon.

James Bowman, a friend of appellant's family, gave a statement to police officers shortly after the incident. In his statement, Bowman told officers that, just prior to the shooting, he brought his stepdaughter to Kirk's Market so that she could purchase a drink before school. While his stepdaughter was inside the market, the appellant got into Bowman's car and began telling Bowman that he had been robbed earlier that morning. Suddenly, a car pulled beside them, and the appellant told Bowman that the men who robbed him were in the car. The appellant then got out of the car and told his brother, Fred Lowery, and his cousin, Jay Harris, "[t]hat's it, boys, right here." When the appellant, Fred Lowery and Harris surrounded the building, Bowman left with his stepdaughter. Bowman dropped his stepdaughter off at school, and when he drove past Kirk's Market on his way home, Boatwright and Hartsell had been shot.

The state also presented the testimony of Mary Santos, who had previously been romantically involved with the appellant's uncle, Walter

Lowery.  Santos testified that Walter hired the appellant and the victim, Vincent Hartsell, to sell drugs for him.  She stated that in late Spring or early Summer 1996, the appellant and Walter were angry with Hartsell over a botched drug sale.  Santos testified that, on several occasions, the appellant stated that he would kill Hartsell in retaliation.

The appellant presented an alibi defense at trial. Fred Lowery, Jay Harris and Greg Moore testified that they were at Kirk's Market during the shooting on October 8.  None of these witnesses saw the person who shot Boatwright and Hartsell, but all testified that the appellant was not present during the shooting.  In addition, Tamera McMillan, the appellant's neighbor, testified that the appellant was at her home during the time of the shooting.

*Lowery*, 2000 WL 748103, at *1-2.

### Coram nobis hearing

At the hearing on October 2, 2014, William Boatwright, the surviving victim of the shooting, testified that he went to Kirk's Market with Vincent Hartsell on October 8, 1996.  He testified that he "was shot coming out the store from purchasing some candy and other juice and stuff like that."  Boatwright testified that he arrived at the store "[a]round about 5:30, 6:00."  When he walked out of the store, he saw that Hartsell had been shot.  Boatwright was then shot.  He ran back inside the store, and the cashier was screaming.  He ran outside again, and he saw Malik Hardin.  Boatwright checked on Hartsell and saw that he had been shot in the neck.  Boatwright drove to Austin Homes and "fell out [and] woke up in the hospital."

While he was in the hospital, police showed Boatwright a photo lineup. Boatwright testified that he identified Petitioner as the shooter because the police told him that they knew he had committed aggravated robbery and murder.  He testified, "[s]o they like, well is this the person that did it?  So I – yeah, he the one did it.  Just to keep them, you know what I'm saying, from, I guess, charging me for the murder charge."  Boatwright testified that police "just kept pointing at [Petitioner's] picture" in the lineup.

Boatwright testified that he did not know who shot him.  He testified that he identified Petitioner in the photo lineup because he "was more afraid that they was going to charge [him] with the murder, so, therefore, you know – the way they came to me was like, either he get charged or you get charged."  Boatwright testified, "I'm not fixing to get charged for something I didn't do, so why not say he did it?"

- 4 -

On cross-examination, Boatwright acknowledged that he was serving a 49-year sentence for especially aggravated robbery, aggravated robbery, and burglary. He denied that he had any concerns about being known as a "snitch" in prison. He acknowledged that he and Petitioner were both incarcerated in Morgan County. He testified, "I mind my own business. I don't speak to him. I don't know him. So I just mind my own business." Boatwright acknowledged that his memory had faded since the incident, but he testified, "[b]ut everything that I said was made up just to keep them from charging me with this murder charge."

Boatwright contested a police report that indicated that a detective spoke with him in the hospital approximately 30 minutes after the shooting. He testified that he did not remember telling the investigator that a man he knew as "J.B." did the shooting. On redirect, Boatwright testified that the robbery that the police were trying to "pin" on him was a robbery of Petitioner on the night before the shooting.

Malik Hardin testified that he was at Kirk's Market "early in the morning" on October 6, 1996. He saw Hartsell and Boatwright "arguing with a couple other guys in the store." While he was at the counter making a purchase, he "asked them was everything okay. They, like, yeah, everything cool." Hardin then walked out of the store. Hardin testified that he got in his car and turned up the music, and he saw "a guy in motion, like with his back towards me." The man turned around, and Hardin saw a gun in his hand. Hardin testified that the man opened the door to the store, reached inside, and then ran toward Prince Hall apartments. Hardin testified that he saw another man carrying a gun exit the store and run in the same direction. Another man drove away in "a little blue car" parked in front of the store.

Hardin walked around the building and saw Hartsell "hanging out of the car, like bleeding out his neck." Hardin testified that the Boatwright was inside the store, "in a tirade going off, like, 'man, that dude shot me, he shot me.'" Boatwright came out of the store, took the keys to Hardin's car, and drove away. Hardin stayed with Hartsell until an ambulance arrived. When the police arrived, they handcuffed Hardin. He testified that he "was out on bond for something[,]" and he was nervous that he would be charged for the shooting. At the police station, Hardin was shown a photo lineup. He testified that the officer pointed at one of the photos and asked him if that was the shooter. Hardin testified that the man in the photo "kind of resembled the guy who [he] had seen running from the car with the gun." Hardin acknowledged that he identified Petitioner as the shooter. He testified, "[n]ow that I've seen [Petitioner], like, close up, I know 100 percent certain that it wasn't [Petitioner]." He testified that the shooter resembled Petitioner, but the shooter was shorter than Petitioner.

- 5 -

On cross-examination, Hardin acknowledged that another inmate had prepared an affidavit "on behalf of" Petitioner and brought it to him to sign. He testified that he was serving a 15-year sentence. He acknowledged that he identified Petitioner at trial as the shooter even though he was no longer afraid that the police might charge him with the shooting. He testified that he identified Petitioner "[b]ecause he resembled the guy who had done it."

Loretta Turner was working as a cashier at Kirk's Market at the time of the shooting. She testified that at approximately 5:45 a.m., seven or eight people entered the store, and she "got a little nervous because [she] thought probably they was there to rob [her]." She testified that when they approached the counter to pay, "they started fussing among themselves." She asked them to stop, and "one guy, he kind of chewed [her] out." When the men left the store, Turner heard gunshots. She testified that she did not see the shooting. She also testified that it was dark outside at the time of the shooting. Turner testified that she had met Petitioner once prior to the shooting, and she did not see him in the store on the day of the shooting.

In its order denying the petition, the court stated that it "listened to the witnesses' testimony and observed their demeanor on the stand." The court found that neither Boatwright nor Hardin were credible witnesses and that they were "vague and inconsistent in their testimony." The court found both witnesses' testimony to be untruthful. The court found that Ms. Turner "appeared to be telling the truth as best she could" but noted that "she was ducking and hiding when the shooting began."

*Analysis*

Petitioner contends that the trial court abused its discretion by denying his petition for writ of error coram nobis. The State responds that the trial court acted within its discretion. Additionally, the State asserts that the trial court erred by not dismissing the petition as time-barred.

A proceeding in the nature of a writ of error coram nobis is available to convicted defendants in criminal cases. T.C.A. § 40-26-105(a). Whether to grant or deny a petition for writ of error coram nobis on its merits rests within the sound discretion of the trial court. *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007). Coram nobis claims may be based on newly discovered evidence:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge

> determines that such evidence may have resulted in a different judgment,
> had it been presented at the trial.

T.C.A. § 40-26-105(b).

Coram nobis claims are subject to a one-year statute of limitations. T.C.A. § 27-7-103 ("The writ of error coram nobis may be had within one (1) year after the judgment becomes final. . . ."). The statute of limitations is computed from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion. *State v. Mixon*, 983 S.W.2d 661, 670 (Tenn. 1999). Whether a claim is barred by an applicable statute of limitations is a question of law, which we review de novo. *Brown v. Erachem Comilog, Inc.*, 231 S.W.3d 918, 921 (Tenn. 2007). We construe the coram nobis statute of limitations consistently with the longstanding rule that persons seeking relief under the writ must exercise due diligence in presenting the claim. *Mixon*, 983 S.W.2d at 670. The State bears the burden of raising the bar of the statute of limitations as an affirmative defense. *Harris v. State*, 102 S.W.3d 587, 593 (Tenn. 2003).

In the appeal from the trial court's summary dismissal of the petition, a panel of this court addressed the statute of limitations issue. The panel found that the State did not raise the untimeliness of the petition as an affirmative defense in the lower court. *Lowery*, 2013 WL 4767188, at *4. Additionally, the panel noted that the trial court did not deny the petition on that basis. *Id*. On remand, however, the State filed a response to Petitioner's amended petition, and the State now asserts that the trial court should have dismissed the petition as time-barred because Petitioner failed to argue that due process required the tolling of the statute of limitations.

When a petitioner seeks a writ of error coram nobis based on newly discovered evidence of actual innocence, due process considerations may require tolling of the statute of limitations. *Workman v. State*, 41 S.W.3d 100, 101 (Tenn. 2001). These due process considerations refer to the principle that "before a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." *Burford v. State*, 845 S.W.2d 204, 208 (Tenn. 1992).

To determine whether due process requires tolling, a court must weigh the petitioner's interest in obtaining a hearing to present a later-arising ground for relief against the State's interest in preventing stale and groundless claims. *Workman*, 41 S.W.3d at 103. In balancing these interests, a court should utilize a three-step analysis:

(1) determine when the limitations period would normally have begun to run;
(2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and
(3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

*Sands v. State*, 903 S.W.2d 297, 301 (Tenn. 1995).

In this case, Petitioner filed his petition for writ of error coram nobis more than ten years after his judgment became final in 1998. The second step in the analysis requires a determination of whether Petitioner's grounds for relief – the recantation of witness testimony – actually arose after the limitations period normally would have commenced. Petitioner has not specified when he became aware of this new evidence. His petition stated that he made contact with the three witnesses "[s]ince the judgment was affirmed on direct appeal[.]" The opinion on direct appeal was filed on June 12, 2000, and Petitioner filed his petition for writ of error coram nobis on September 14, 2011, more than 11 years later. The third step in the analysis requires a determination of whether Petitioner was given a reasonable opportunity to present his claims. Because Petitioner has failed to establish when he became aware of the new evidence, and with an 11-year gap between the judgment becoming final and the filing of his petition, it is difficult to determine the reasonableness of the delay in presenting his claims.

However, this court's decision in the first appeal is the law of the case. The doctrine of the law of the case permits the foreclosing of argument on an issue that was previously decided in an appeal of the same case. Our supreme court explained in detail its interpretation of this doctrine in *Memphis Publ'g. Co. v. Tennessee Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303 (Tenn.1998):

The phrase "law of the case" refers to a legal doctrine which generally prohibits reconsideration of issues that have already been decided in a prior appeal of the same case . . . . [W]hen an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case which generally must be followed upon remand by the trial court, and by an appellate court if a second appeal is taken from the judgment of the trial court entered after remand.

*Id*. at 306 (citations omitted).

- 8 -

The State did not file a Petition to Rehear in the first appeal concerning this court's determination that the statute of limitations issue could not be considered, nor did the State seek review by the Tennessee Supreme Court. A panel of this court ordered an evidentiary hearing that should have been held at the time the case was initially filed. The State's current argument concerning the statute of limitations is without merit.

In this case, the trial court found the testimony of Boatwright and Hardin was not truthful. The court stated that it "listened to the witnesses' testimony and observed their demeanor on the stand." It determined that their testimony at the coram nobis hearing was not credible. Inherent in the determination of whether a petitioner is entitled to relief based upon recanted testimony is the trial court's determination of whether the witness recanting his or her testimony is credible. A petitioner is not entitled to coram nobis relief based on recanted testimony unless the coram nobis court is reasonably satisfied that the prior testimony was false and the present testimony is true. *State v. Ratliff*, 71 S.W.3d 291, 298 (Tenn. Crim. App. 2001).

Petitioner asserts that the court's "credibility determination is premised on the idea that [Boatwright] started discussing the threats of the murder charge and only remembered the aggravated robbery on redirect." In its order denying relief, the trial court found:

> Boat[w]right stated that he testified falsely at trial because the police instructed him to and threatened to prosecute him for shooting Hartsell (Vincent Hartsell was also shot during the attack. He died of his injuries the next day.) On redirect Boat[w]right remembered that it was the armed robbery of the petitioner that the police were threatening to charge him with unless he named petitioner as the person who shot Boat[w]right and that was why he testified as he did at trial.
>
> Hardin testified that he was holding Hartsell's bleeding body when the police arrived and accused him of shooting Hartsell, put him in cuffs, and were driving him to the police station when they showed him a photo line-up and pointed to the picture of an individual who did bear some resemblance to an individual he had seen running away from the scene right after the shootings. He testified further that he is now 100% sure that the individual he saw running away from the scene was not petitioner.
>
> The court listened to the witnesses' testimony and observed their demeanor on the stand. Loretta Turner appeared to be telling the truth as best she could but did admit to being nervous that morning because

- 9 -

seven or eight people came in the store all at once and she thought they were going to rob her. Also she was ducking and hiding when the shooting began.

The trial court concluded that although Ms. Turner's testimony was credible, her testimony was cumulative of other witnesses who testified at trial that Petitioner was not present at Kirk's Market on the day of the shooting. The court concluded that in light of the evidence presented at trial, "this court does not find that the cumulative evidence of Loretta Turner may have caused the jury to reach a different result."

The coram nobis court was able to see and hear the witnesses' testimony at the evidentiary hearing and was in the best position to evaluate their credibility. "[A]ppellate courts do not reassess credibility determinations." *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009). Petitioner is not entitled to relief.

## CONCLUSION

In accordance with the foregoing reasoning and authorities, we conclude that the coram nobis court did not err when it dismissed Petitioner's petition for writ of error coram nobis.

_____
THOMAS T. WOODALL, PRESIDING JUDGE